KENNETH J. RIEMER
RIEMER LAW LLC
2153 Airport Boulevard
Mobile, AL 36606
  (251) 432-9212
  kjr@Riemer-Law.com

Constance Van Kley*
  Van Kley Law PLLC
  P.O. Box 451
  Missoula, MT 59806
  (605) 517-0673
  constance@vankleylaw.com

Rylee Sommers-Flanagan*
Molly Danahy*
  Upper Seven Law
  P.O. Box 31
  Helena, MT 59624
  (406) 396-3373
  rylee@uppersevenlaw.com

Daniel A. Zibel*
Alexander S. Elson*
  National Student Legal Defense
  Network
  1701 Rhode Island Ave NW
  Washington D.C. 20036
  (202) 734-7495
  dan@defendstudents.org
  alex@defendstudents.org

Anna M. Singleton*
  Chehardy, Sherman, Williams,
  Recile & Hayes, LLP
  One Galleria Blve. Ste. 1100
  Metairie, LA 70001

*Attorneys for Plaintiff*
*\*Pro hac vice forthcoming*

## UNITED STATES DISTRICT COURT,
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| HALEY CLEMENTS, <br><br> *Plaintiff,* <br><br> vs. <br><br> XAVIER BECERRA, as Secretary of the Department of Health & Human Services; the UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, a federal department; CAROLE JOHNSON, as Administrator of the Health Resources & Services Administration; and the HEALTH RESOURCES & SERVICES ADMINISTRATION, a federal agency, <br><br> *Defendants.* | Cause No. _____ <br><br> **Complaint** |

## INTRODUCTION

1.      Plaintiff Haley Clements ("Ms. Clements") was born and raised in Eufaula, Alabama, where she still resides today, raising three children with her husband, caring for her ailing parents and in-laws, and serving her community as a Nurse Practitioner.

2.      After six years of working at a rural health clinic in her hometown, Ms. Clements signed a contract in July 2020 to participate in a federal program overseen by the Health Resources & Services Administration ("HRSA" or the "Agency"), an agency within the United States Department of Health & Human Services (the "Department"). The program provides scholarships to students and loan repayment grants to graduates like Ms. Clements. The contract obligated her to continue working at either the same rural health clinic or another that meets Agency criteria for three years in exchange for a student loan repayment grant of $25,187.76—the amount of her remaining student loan debt.

3.      Now, absent judicial relief, the federal government will fine Ms. Clements a minimum of $217,500 because she is unable to relocate her family or find a job that meets Agency criteria in Alabama, let alone close enough to Eufaula to commute.

4.      Ms. Clements expected to satisfy the contract's terms—she loved her job and planned to stay at the clinic for the remainder of her career. Through no fault of her own, it became impossible to fulfill the terms of her contract without uprooting her family. Within months of signing the contract—and before the grant money was

disbursed—she was left, unexpectedly, without a supervising physician at the clinic. She could not stay at the clinic without jeopardizing her medical license, and she was forced to resign.

5.     Ms. Clements informed the Agency of her changed circumstances before any funds were disbursed, but the Agency did not terminate the contract.  She has done everything possible to return the grant money—including overnighting a check for $25,187.76 to the Agency upon request (only for the Agency to return it four months later).  She has kept the money separate and available since receiving it in October 2020.

6.     The Agency refused to terminate Ms. Clements's service obligation and has continually demanded that she "return to service" at a rural healthcare clinic that satisfies a narrow set of criteria.  Ms. Clements has tried to meet the Agency's demands, but there have been no qualifying Nurse Practitioner jobs near her home in Eufaula.  Offering what it refers to as "site assistance," the Agency gave her 90 days to relocate to either New York or Florida to work at a substance use disorder treatment facility.

7.     The next "site assistance notification" Ms. Clements received gave her the option to relocate to either Maryland or North Carolina to satisfy the contract's terms.

8.     The Agency also refused to credit Ms. Clements for her six years of prior service at the same clinic where she worked upon qualifying for the Program.

9.      Although she treats a rural and underserved population in her current job (in Eufaula, an underserved area), the Agency will not credit her for this work.

10.     Because Ms. Clements has been unable to satisfy the terms of the contract, the Agency seeks to enforce it by levying breathtaking financial penalties. It has projected these penalties twice, and the numbers differ.  She owes either $20,035.20 in grant principal and $217,500.00 in punitive damages or $24,382.67 in grant principal and $262,500 in punitive damages.  The damages amount equals, at minimum, <u>10.77 times</u> the principal.  *See State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 425 (2003) (even where egregious conduct warrants punitive damages, "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process").

11.     In addition to the penalties, the Agency will impose interest at the maximum legal rate as of the time of the date of contract breach—which the Agency itself has identified as either October 9, 2020, or December 29, 2022.  Thus, the interest rate is either 10.25% or 11.25% annually, compounded daily.  Even at the lowest penalty and lowest interest rate, the interest to be assessed in the first year after the (now-past) breach date equals over $25,000, more than the entire amount of her outstanding student loan debt before entering the Program.

12.     Not only has Ms. Clements done nothing wrong, she has jumped through every imaginable hoop to remove her service obligation and the financial penalties. She tried to return the money; she sought approval for alternative worksites; she applied for temporary Covid-19 emergency site approval; she searched for local jobs;

*Complaint*                                                                                                    4

she filed a waiver request; and upon invitation from the Agency, she filed a request for reconsideration. She found no relief in the Agency's opaque and inconsistent processes.

13. The Agency violates the Eighth Amendment because it imposes extraordinary financial penalties for legally innocent conduct. The Agency violates the Seventh Amendment by imposing financial penalties without a jury trial—or, indeed, even an agency tribunal. The Agency's imposition of penalties is unlawful because it is based on a misinterpretation of federal law. Finally, the Agency unlawfully denied a petition for rulemaking that, if granted, would have prevented the imposition of penalties against Ms. Clements. *See* Ex. A, Pet'n for Rulemaking, *In re: National Health Service Corps Loan Repayment Program* (Aug. 8, 2022) ("Pet'n for Rulemaking").

## JURISDICTION AND VENUE

14. Plaintiff brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 704. This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the issues in controversy arise under the Constitution and laws of the United States.

15. This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and injunctive relief under Federal Rule of Civil Procedure 65.

16. This Court has personal jurisdiction over Defendants as agents of the United States.

17.    Venue is proper in the Northern Division of the Middle District of Alabama because Ms. Clements resides in Barbour County, Alabama, no real property is involved in this action, and Defendants are officers or employees of the United States.  28 U.S.C. § 1391(e)(1); D. Mont. L.R. 3.2(b).

## PARTIES

18.    Plaintiff Haley Clements is an adult resident of Barbour County, Alabama.

19.    Defendant Xavier Becerra is the Secretary of the United States Department of Health & Human Services ("Secretary").

20.    Defendant Carole Johnson is the Administrator of the United States Health Resources & Services Administration.

21.    The Department of Health & Human Services houses the Health Resources & Services Administration.

22.    The Agency oversees National Health Service Corps ("NHSC") loan and grant program (the "Program") applications and requests for waivers of service obligations.

23.    Both the Department and the Administration are "agencies" within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1) (with certain inapplicable exceptions, an "agency" is "each authority of the Government of the United States, whether or not it is within or subject to review by another agency").

## FACTUAL ALLEGATIONS

24.     Haley Clements was born and raised in Eufaula, Alabama, where she has lived for over forty years.

25.     For two years, Ms. Clements attended Wallace Community College in Eufaula on a full academic scholarship.  She transferred to Southern Union Community College, in Opelika, Alabama, where she received her associate degree in nursing in 2004.  She attended Southern Union on a Pell Grant, which provides need-based grants to low-income undergraduate students to promote access to education.

26.     Upon graduation, she began working at the non-profit East Alabama Medical Center ("EAMC") in Opelika, a short forty-five-minute drive from her hometown.  While at EAMC, Ms. Clements traveled to Honduras with her hospital to assist in building a medical clinic in a rural part of the country and provide healthcare screenings to the residents.  During her tenure at EAMC, she attended Troy University and completed her Bachelor of Science in Nursing in 2006.  She went on to continue her education at Troy University, and in 2014, she earned her Master of Science in Nursing and became a licensed Nurse Practitioner.

27.     While completing her degree at Troy, Ms. Clements completed a one-year unpaid clinical rotation for the Southeast Alabama Rural Health Associates ("SARHA").  When she graduated, Ms. Clements began working full-time at SARHA as a Nurse Practitioner.  In that role, she was supervised by two physicians.

28.     At SARHA, Ms. Clements learned of the Program from her colleagues. SARHA was an NHSC-approved site, and participation would give her the ability to pay off all her remaining student loan debt simply by continuing to work in her current job.

29.     In 2015, Ms. Clements submitted her first application to the Program. Her application was denied to a lack of funding.  The Program encouraged her to reapply during the next application cycle, which Ms. Clements did on multiple occasions.  These applications were also denied due to a lack of funding.

30.     She applied again on May 12, 2020.  This time, her application was approved.

31.     Asked to identify the reasons for her application to the Program, Ms. Clements checked only one box: "Opportunity to serve in my rural home community." She identified SARHA's Internal Medicine in Eufaula as her service site.

32.     On July 1, 2020, following a request from the Agency, Ms. Clements confirmed her interest in participating in the Program.  She specifically identified SARHA by name and address in both her original application and in the confirmation of interest form.  Shortly thereafter, she received an email stating that her application had been accepted and that she would receive a grant of $25,187.76— the amount of her remaining student loan debt—in exchange for three years' service in the Program.

33.     Ms. Clements loved her job and expected to remain at SARHA for at least another three years, and she accepted.  She signed the contract, which was fully executed on July 24, 2020.

34.     Ms. Clements's contract obligates her to serve in a rural health clinic—no surprise, given her intention to satisfy the contract at SARHA, in rural Alabama. What was unexpected, however, was the contract's purported requirement that she serve at a substance use disorder treatment facility.

35.     Ms. Clements is not certified to provide treatment for substance use disorder, and she has no experience in the field.  In her application, she was asked whether she held particular certificates to treat patients with substance use disorders.  She answered truthfully that she did not.  Indeed, SARHA's policy was to refer patients suffering from substance use disorders to other facilities.

36.     In fact, Ms. Clements responded "no" to all questions related to substance use disorder treatment in her application, including the question that asked if she intended to become qualified/certified to provide such treatment in the future.

37.     Within months of signing, and before the grant funds were disbursed, Ms. Clements's employment situation changed significantly.  One of her supervising physicians retired and relocated to Birmingham, Alabama to care for his wife, who was newly diagnosed with dementia and whose health had deteriorated, and to be closer to their daughter.  Ms. Clements's other supervising physician died of neuroendocrine cancer shortly thereafter, on September 11, 2020.  The clinic

unsuccessfully attempted to recruit a new physician.  There is currently no Eufaula-based supervising physician at the clinic.

38.     With no physician remaining to supervise her work, Ms. Clements was unable to provide care for her patients at SARHA.   After consulting with the Alabama Board of Nursing, she left the clinic to prevent jeopardizing her medical license.

39.     Shortly after her supervising physician passed, Ms. Clements informed a HRSA agent of her situation during a telephone call—after the contract was executed but before the funds had been disbursed.  The HRSA agent told her that she could not terminate the contract simply because her supervising doctor had died. Ms. Clements nonetheless explained her situation again, via the NHSC's online participant portal, on October 26, 2020, six days after she received the loan repayment grant funds.

40.     Although Ms. Clements made best efforts to prevent the transfer of funds in the first instance, the grant was disbursed to her account on October 20, 2020.  She has not touched the $25,187.76 she was awarded, and the funds remain available in her savings account.

41.     After the funds were disbursed, Ms. Clements searched for an NHSC-approved job within commuting distance from her home.  According to her contract, she was required to find work as a Nurse Practitioner in a rural NHSC-approved substance use disorder treatment facility, even though she applied and was approved to work at a site that was not certified and did not provide such treatment.

42.     Ms. Clements was unable to find any NHSC-approved job for which she was qualified that was reasonably close to Eufaula, let alone a job at a substance use disorder treatment facility.

43.     The Agency located and recommended four other rural NHSC-approved substance use disorder treatment sites to Ms. Clements.  Those sites were in New York, Maryland, Florida, and North Carolina.

44.     Ms. Clements reached out to one of her U.S. Senators, Katie Britt, for assistance in dealing with the Agency.  In response to an inquiry from Senator Britt's office, the Agency located potential sites in Marianna, Florida; Jesup, Georgia; and Talladega, Alabama.  The closest of these cities, Talladega, is over two-and-a-half hours from Eufaula; the site identified there is a federal prison, and it is unclear whether it qualifies as a substance use disorder treatment facility.

45.     Ms. Clements contacted medical providers across Alabama during her job search.  Although no NHSC-approved site was hiring nurse practitioners, she provided her resume to be kept on file.  At no time has she been able to work at a site that both satisfies the contract and falls within reasonable driving distance from Eufaula.

46.     Upon notification from the Agency that the death of her supervising physician would not qualify her for termination of her contract, Ms. Clements requested and received a temporary suspension of her contract due to Covid-19 on December 16, 2020, while she looked for a job that would satisfy the Agency's requirements.

47.     With her suspension set to expire, Ms. Clements initiated another contract termination request on June 14, 2021, when she again attempted to return the disbursed funds.

48.     On June 22, 2021, A HRSA representative emailed Ms. Clements in response to her termination request.  The representative wrote:

> I am sorry to inform you that it is too late for you to terminate your 2020 contract. You had 60 days from the date your contract was countersigned by the Secretary's designee, which was 7/24/2020 to request a termination of your contract.  Please contact the Division of Participant Support and Compliance Office at 301-594-4200 for guidance or assistance.  Your request in the termination portal dated 6/14/2021 will be denied.
>
> In addition to receiving your termination request.  <u>I see that you received your disbursement after you requested to terminate your contract.  I will need you to return the funds.</u>  Please return via a check made payable to "DHHS Collections Officer", and send to the following address within the next 2 weeks and make sure to send them via a track-able and secure method:
>
> Division of National Health Service Corps
> Financial Management Branch
> Attn: Monique S. Browning, Room 14N 94B
> 5600 Fishers Lane Rockville, MD 20857

49.     Ms. Clements immediately sent a check for $25,187.76 to the Agency via FedEx overnight delivery.  The package was signed for by a HRSA representative on June 23, 2021.

50.     Months later, the NHSC informed Ms. Clements that the request to return the funds was an error.  On October 30, 2021—over four months after she sent the check—she received a package with her returned check and a letter stating that the Agency had made a mistake .

51.     During this time, Ms. Clements could not afford to remain unemployed, and because she could find no NHSC-qualifying site, she was forced to broaden her search for employment.  Not only does Ms. Clements provide financial support for her three children, Ms. Clements covers living expenses and provides daily medical support for her elderly parents.

52.     Ms. Clements began working as a contract employee at Crowne Health and Rehab ("Crowne"), a nursing home and rehabilitation facility in Eufaula on October 26, 2020.  At Crowne, Ms. Clements cares for many of the patients that she saw at SARHA.  Eighty-five percent of Crowne's clients are on Medicaid.

53.     During the pandemic, Ms. Clements oversaw Crowne's covid-19 treatment site, where she provided essential care to Eufaula's most vulnerable residents.  She assisted individuals with Medicaid applications, administered free vaccine clinics open to all, and cared for the uninsured, underinsured, and homeless.

54.     A HRSA agent informed Ms. Clements about emergency covid-19 site approval, stressing that it was a flexible option to ensure that participants receive credit for meeting critical covid-19-related needs in underserved areas.  With the agent's encouragement, she sought emergency approval for two locations.

55.     Ms. Clements's emergency site approval was denied on the grounds that Crowne had not implemented a sliding-fee scale.  At no point was Ms. Clements informed that a sliding-fee scale was required for site approval.

56.     Ms. Clements also sought emergency site approval for her legal employer, Southern Clinic LLC in Dothan, Alabama.  This request was also denied.

57.     Through no fault of her own, after six years of service at SARHA prior to acceptance into the Program, Ms. Clements has been unable to complete the Program's service obligation.

58.     Ms. Clements is unable to move away from Eufaula for three years, and it is unreasonable to expect her to do so.  She has three school-aged children, one of whom suffers from a condition requiring extensive support, and another of whom requires intervention specialist support twice weekly at school.  All three children would suffer educational and social setbacks if forced to relocate.

59.     Ms. Clements has also assumed financial and caregiving obligations for her parents, who reside in Eufaula.  Her father suffers from several chronic health conditions that limit his ability to perform activities of daily living, and she oversees his healthcare and provides his transportation.  Ms. Clements pays for her parents' daily living expenses, including their mortgage, groceries, and insurance.

60.     Ms. Clements's mother-in-law was diagnosed with brain cancer early in 2024.  She also lives in Eufaula and depends on her daughter-in-law for caregiving and assistance with her significant medical needs, including recovery from brain surgery, which left her unable to ambulate without assistance.  Ms. Clements currently has primary responsibility for her mother-in-law's caregiving.  Her mother-in-law recently began her third round of chemotherapy; she requires a mechanical lift to get out of bed and is permanently confined to a wheelchair.

61.     The Agency never informed Ms. Clements that she could seek a waiver of her service and/or payment obligation, despite its clear knowledge of her difficulty

in finding a local site.  She only learned of the option when she contacted a field representative for her U.S. Representative, Congressman Barry Moore, and the representative informed her of the waiver process and provided her with documentation to begin the process.

62.    Ms. Clements first requested a complete or partial waiver of her service and/or financial obligation in August 2022.  She explained the facts that led to her resignation from SARHA and provided all required financial and medical information relating to her request.

63.    On June 30, 2023, the Agency denied Ms. Clements's waiver request. The Agency refused to consider the toll that a cross-country move would take on Ms. Clements and her family.  And it entirely disregarded important facts: that Ms. Clements's resignation from SARHA arose from factors outside her control; that she worked at SARHA for six years before she was approved for the Program; that, upon invitation, she attempted to return the money; that she sought site approval for two other sites; that she has continually served a rural, underserved population; and that the penalty the Agency seeks to impose would mean financial ruin for Ms. Clements and her family.

64.    Instead, the Agency determined only that Ms. Clements physically was able do the work of a Nurse Practitioner—a finding that never was in contention, given her continued service to her community.  It wrote:

> Your documentation indicates that you have been working full-time as
> a Nurse Practitioner at a site that is not NHSC approved.  Therefore,
> we cannot conclude that you suffer from a physical or mental disability

that permanently precludes you from working as a Nurse Practitioner to fulfill your service obligation.

65.    Ms. Clements submitted evidence demonstrating that she provides direct care to family members with disabilities.  The Agency considered only whether Ms. Clements's family obligations would prevent her from working as a Nurse Practitioner:

> You indicated that you are unable to relocate to complete your NHSC service obligation because you are providing care for family members. . . . We requested updated medical information from your husband and father's medical providers.  However, no additional information was available for our reviewers.  Per medical documentation reviewed, the family members you assist are completing their Activities of Daily Living (ADL) without substantial limitations.

66.    Finally, Ms. Clements provided extensive financial information, as the Agency requires.  The Agency stated that it "reviewed [her] present and estimated future financial resources and obligations to determine whether it would be an extreme hardship to require you to pay the damages you will owe if you elect to breach your service obligation."  But that is not what the Agency did.  Rather, it reviewed evidence of Ms. Clements's modest middle-class expenses, such as a mortgage balance of just under $75,000 on a home with an estimated value of $173,600.  Without considering her financial obligations to her family, the Agency concluded:

> Based on your current age (41 years) and current and future earning potential, we believe that you are capable of generating an income for years to come within the profession for which you received NHSC funding.  The documentation you submitted does not support a finding that you lack the current and future ability to pay your debt (using current and estimated future financial resources) if you elect to breach your contract.

67.     Less than a month later, on July 18, 2023, the Agency sent Ms. Clements a site assignment letter, identifying sites in Maryland and North Carolina. The Agency informed her that she had 90 days to accept employment at either identified site or at another NHSC-approved rural substance use disorder treatment site. As before, Ms. Clements remained unable to find an acceptable site within driving distance of her home.

68.     Ms. Clements retained counsel, who began communicating with the Agency on her behalf. The Agency invited Ms. Clements to submit a request to reconsider the waiver denial. The reconsideration request was submitted on December 31, 2023.

69.     The Agency repeatedly assured Ms. Clements and her counsel that its review of reconsideration would be expedited. Despite regular requests for a final determination, the Agency has refused to resolve the reconsideration request. Thus, Ms. Clements's waiver request remains denied.

70.     Because Ms. Clements is unable to complete the Program's terms, she will, upon a determination by the Agency that she is in default, be required to: (1) return the grant; (2) pay damages exceeding 10x the loan repayment grant principal; and (3) pay interest at the maximum legal rate (at least 10% annually), compounded daily.

71.     Ms. Clements is unable to return the loan or pay treble damages until the Agency declares her account to be in default. And, although there is nothing she

can do to mitigate her damages, the Agency will impose interest, going back to the date of breach, on both the loan principal and punitive damages.

## LEGAL & REGULATORY BACKGROUND

72.     Through the Emergency Health Personnel Act, Congress established the NHSC in 1970 to offer scholarships to students in return for service in medically underserved areas. Pub. L. 91-623 (Dec. 31, 1970), 84 Stat. 1868. In 1987, Congress authorized the Department to extend the NHSC's programming to include loan repayment grants. *See* 42 U.S.C. § 254*l*-1.

73.     Through the Program, HRSA offers loan repayment grants to medical providers who work at NHSC-approved facilities. When Ms. Clements applied, the standard contract provided a $50,000 grant in exchange for two years of full-time service.

74.     Ms. Clements was classified to the Rural Community Loan Repayment Program, which authorized a higher loan repayment grant amount in exchange for three years of full-time service. Because she owed only $25,187.76 for her student loans, the higher maximum grant amount was irrelevant.

75.     By statute, when a Program participant does not compete her service obligation,

> the United States shall be entitled to recover from the individual an amount equal to the sum of—
>
> (A) The total of the amounts paid by the United States . . . for any period of obligated service not served;

> (B) An amount equal to the product of the number of months of obligated service that were not completed by the individual, multiplied by $7,500; and
>
> (C) The interest on the amounts described in subparagraphs (A) and (B), at the maximum legal prevailing rate . . . from the date of the breach[.]"

42 U.S.C. § 254*o*(c)(1).

76.     Congress delegated rulemaking authority to the Secretary to "provide for the partial or total waiver or suspension of any obligation of service or payment by [a participant] whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable." 42 U.S.C. § 254*o*(d)(2).

77.     Under the implementing regulations, "[c]ompliance . . . will be considered impossible if the Secretary determines . . . that the participant suffers from a physical or mental disability resulting in the permanent inability of the participant to perform the service or other activities which would be necessary to comply with the obligation." 42 C.F.R. § 62.12(c).

78.     Although the statutory scheme requires the Secretary to consider not only "impossibility" but also "extreme hardship" and "unconscionab[ility]," the implementing regulations apply all three terms as if they were coextensive:

> In determining whether to waive or suspend any or all of the service or payment obligations of a participant as imposing an undue hardship and being against equity and good conscience, the Secretary, on the basis of information and documentation as may be required, will consider:
>
> (1) The participant's present financial resources and obligations;

(2) The participant's estimated future financial resources and obligations; and

(3) The extent to which the participant has problems of a personal nature, such as physical or mental disability, terminal illness in the immediate family which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred.

42 C.F.R. § 62.12(d).

79.     Congress never intended the Program's penalty to be applied to individuals who, like Ms. Clements, are unable to comply with the Program's requirements through no fault of their own.

80.     To the contrary, Congress designed the penalties to deter participants from taking the benefit and then intentionally abandoning their service commitment to, for example, pursue more lucrative work. As then-Representative John Kasich explained:

> These are people who got the loans based on the supposition they were going to go to the rural areas and they never went. . . . We are not talking about the people who lived up to their obligations.  We are talking about people who failed to live up to their obligations.  <u>We are talking about the couple who does not want to pay, where they pay their maid more than it costs to repay their loan; the doctor with his $200,000 income who welshed on his deal.</u>  That is what we are looking at here.
>
> . . .
>
> I want to make it clear that what we want to do is to take the few who are abusing the system and make sure we get on them. . . . <u>It is not to cast dispersions [*sic*] on the program or the physicians who contribute so much every single day but on the ones who are the rotten apples in that barrel.</u>  Let us get them out of it and let us make them pay."

133 Cong. Rec. H23617-23618 (Sept. 9, 1987) (emphasis added).

81.    Yet the Department has long interpreted the § 62.12(d) factors as exhaustive and declined to consider other factors.  *See, e.g.*, *Rendleman v. Shalala*, 21 F.3d 957, 961 (9th Cir. 1994) ("[T]he agency's decision to interpret this regulation as identifying each and every relevant consideration is neither plainly erroneous nor inconsistent with the regulation.  While the regulation does not absolutely foreclose the relevance of other evidence, this potential for breadth does not invalidate the agency's more limited and reasonable construction of the regulation."); *United States v. Kokayi*, 968 F. Supp. 870, 876 (E.D.N.Y. 1997) ("[I]t has been held that the regulation is exclusive and that HHS need not consider other factors in determining whether to grant a waiver.") (citing *Rendleman*, 21 F.3d at 961).

82.    The Agency continues to employ this inflexible, extreme, and atextual approach in applying the statutory penalty and waiver provisions.  For example, in opposing a program participant's motion for preliminary injunction, the Department recently argued that it lacked authority to broadly consider individual circumstances because "[u]nder the regulations, <u>only</u> extreme personal problems are considered such as physical or mental disability and terminal illness."  Fed. Defs.' Br. Opp. Mot. for Prelim. Inj., *Johnson v. Becerra,* No. CV-22-55-GF-BMM, Dkt. 14 at 20 (D. Mont. Sept. 2, 2022) (emphasis added); *see also* Ex. A, Pet'n for Rulemaking, at Ex. F (denial of waiver request by program participant Brandi Barrick, dated July 30, 2020).  This interpretation is inconsistent with the statutory scheme.

83.    By continuing to assess onerous penalties without providing meaningful exceptions for deserving participants, the Department not only hurts Program

participants who cannot complete their service obligations due to circumstances beyond their control, but also deters future participation by healthcare professionals who have heard of and fear injustice from an unyielding government agency.[1]

84.    On August 8, 2022, the National Student Legal Defense Network and affected participants submitted a petition for rulemaking to the Department, seeking amendment of the Department's regulations to prevent future imposition of extreme penalties against participants who innocently breach their contracts, to authorize more robust consideration of the facts and circumstances giving rise to a breach, and to allow multiple one-year suspensions of participants' service obligations.

85.    By letter dated May 10, 2023, HRSA Administrator Carole Johnson denied the petition without substantial explanation. The denial was based on the Department's inaccurate statement that it used a flexible approach to the consideration of a waiver applicant's circumstances, and that—contrary to the Department's policies and practices over decades (described above)—the § 62.12(d) factors were "non-exhaustive."[2]

---

[1] A private Facebook group dedicated to "those of us who are dealing with the NHSC's exorbitant penalties for not fulfilling service contracts" has amassed more than 650 members. *See* Facebook, Support for NHSC Loan Repayment Program Participants, https://www.facebook.com/groups/271127437607801 (last visited Aug. 19, 2024).

[2] *See* Ex. B, Denial of Pet'n, at 3 (May 10, 2023) ("[A]lthough the agency is required to consider specific factors when reviewing a waiver or suspension request under 42 C.F.R. § 62.12(d), these factors are non-exhaustive, and the regulation allows consideration of all factors . . . . Therefore, there is not a need to pursue rulemaking that enumerates additional factors under § 62.12(d)." (emphasis added)).

## CLAIMS FOR RELIEF

### COUNT I: Violation of the Excessive Fines Clause

86.     The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'"  *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10 (1993)).

87.     The Excessive Fines Clause applies to  punitive civil penalties imposed by federal law.  *See Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021).   The touchstone of the Excessive Fines Clause is the imposition of monetary penalties as "punishment for some offense."  *Timbs v. Indiana*, 586 U.S. 146, 151 (2019) (quoting *Bajakajian*, 524 U.S. at 327–28).

88.     The penalties imposed against Ms. Clements and other program participants are, by their nature, punitive.  Under the Agency's punitive scheme, Ms. Clements will be assessed far greater than treble damages—the penalty to be imposed equals more than ten times the grant principal itself.  Mere treble damages would be inherently punitive.  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784–86 (2000) (Treble damages are "essentially punitive in nature."). "The very idea of treble damages reveals an intent to punish past, and deter future, unlawful conduct."  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981).

89.   By threatening to impose punitive damages against Ms. Clements—damages that are "grossly disproportional to the gravity of the defendant's offense"—the Agency violates the Excessive Fines Clause of the Eighth Amendment. *Bajakajian*, 524 U.S. at 336–37.

90.   The Agency's action should be "h[e]ld unlawful and set aside" as "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

### COUNT II: Violation of the Seventh Amendment

91.   The Seventh Amendment guarantees the right to trial by jury in "all suits which are not of equity or admiralty jurisdiction." *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Parsons v. Bedford*, 28 U.S. 433, 447 (1830)). Actions designed to "punish or deter the wrongdoer rather than solely 'restore the status quo,'" are necessarily legal in nature and therefore vest the right to a jury trial. *Id.* at 2129 (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987)).

92.   "[T]he remedy is all but dispositive." *Id.* Where, as here, an agency "seeks civil penalties, a form of monetary relief," the agency cannot exact its punishment without providing the process the Seventh Amendment requires. *See id.*

93.   By imposing punitive damages against Ms. Clements without a jury trial—and, indeed, without the opportunity to appear before any tribunal at all, the Agency has violated the Seventh Amendment.

94.   The Agency's action should be "h[e]ld unlawful and set aside" as "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

## COUNT III: Arbitrary & Capricious Imposition of Penalty

95.    By statute, the Agency is "entitled" to recover loan grants, impose damages, and assess interest.   42 U.S.C. § 254*o*(c)(1).   The term "entitled" is permissive rather than mandatory, and the statutory language outlines the maximum penalty allowed by law—not the minimum.

96.    The Agency's own regulations similarly provide that it may "waive or suspend <u>any or all</u> of the service or payment obligations of a participant" under certain circumstances.   42 C.F.R. § 62.12(d) (emphasis added).   Impossibility is not required.

97.    In contrast to the plain language of the statute and implementing regulations, which allow for a complete and partial waiver to prevent unconscionable enforcement, the Agency considered only whether Ms. Clements is physically able to work as a Nurse Practitioner.

98.    The Agency's imposition of the maximum statutory penalty rests on a misinterpretation of statutory law and its own regulations.   It therefore should be "h[e]ld unlawful and set aside" as "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).

## COUNT IV: Arbitrary & Capricious Denial of Petition for Rulemaking

99.    On August 8, 2022, the National Student Legal Defense Network and affected participants submitted a petition for rulemaking to the Department under 5 U.S.C. § 553(e).

100.    The petitioners requested amendment of the Department's regulations to (1) state that a Program participant is automatically entitled to a waiver of the statutory penalties where a breach results from being terminated by an NHSC-approved site through no fault of the participant and they are unable to find a reasonable replacement site within 60 minutes of their home; (2) clarify that the reference to "failing . . . to complete such service obligation" in 42 U.S.C. § 254*o*(c) requires fault on the part of the participant; (3) include a list of additional factors the Secretary will consider in determining whether to waive or suspend a participant's service or payment obligations, including but not limited to inability to relocate for reasons such as childcare obligations, custody, family obligations, and financial circumstances, as well as the extent to which the participant was at fault for the termination of their employment; and (4) clarify that there is no limit on the number of one-year suspensions a participant may receive.

101.    The petitioners explained that the Agency's inflexible approach to waiver requests results in punishment for innocent conduct and therefore conflicts with the statutory scheme and Congress's clear intent that penalties be used to deter participants who intentionally abandon their commitment, such as those who leave to pursue more lucrative work.

102.    The Agency denied the petition on May 10, 2023.  Ex. B, Denial of Pet'n (May 10, 2023).  Its denial failed to engage seriously with petitioners' arguments, is contrary to its longstanding policies and practices, and cannot be squared with Congress's express will, as codified in statute.

*Complaint*                                                                                            26

103.   First, the Agency falsely represented that it applies a flexible approach to waiver applications and considers all factors bearing on participants' inability to comply with Program contracts.  The flexible approach described in the Department's petition denial is contrary to the Department's longstanding position—described by multiple courts and revealed by the experiences of Ms. Clements and many others— that the enumerated factors in § 62.12(d) are exhaustive, and that no other factors can be considered when determining an application for a waiver.

104.   Second, the Agency wrote that statutory law requires imposition of the full measure of statutory damages against participants who breach through no fault of their own.  The statute contains no such mandate.  *See* 42 U.S.C. § 254*o*(c)(1).

105.   The Agency's denial of the petition should be "h[e]ld unlawful and set aside" as "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a.   Grant preliminary relief to Plaintiff by staying the effective breach date pending final determination under 5 U.S.C. § 705 ("the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings");

b.   Grant permanent relief to Plaintiff by:

    i.  declaring the imposition of treble damages and additional interest unlawful as applied to Ms. Clements and ordering Defendants to: accept repayment of the original loan amount from Ms. Clements, relieve Ms. Clements from her service obligation, and release Ms. Clements from her contract;

   ii.  vacating the imposition of penalties unless and until Defendants' claim for damages is resolved by a jury;

  iii.  declaring that the Agency erred in its analysis of Ms. Clements's waiver request and remanding for further agency proceedings;

  iv.  declaring that the Department erred in denying the petition for rulemaking and remanding for further consideration;

and

c.  Award Plaintiff her costs, disbursements, and reasonable attorneys' fees incurred in bringing this action, pursuant to 28 U.S.C. § 2412.

Respectfully submitted this 4th day of September, 2024.

> /s/ *Kenneth J. Riemer*
> KENNETH J. RIEMER (RIEMK8712)
> RIEMER LAW LLC
> 2153 Airport Boulevard
> Mobile, Alabama 36606
> Phone: (251) 432-9212
> Email: kjr@Riemer-Law.com
>
> Constance Van Kley*
> Van Kley Law PLLC
>
> Rylee Sommers-Flanagan*
> Molly Danahy*
> Upper Seven Law

Daniel A. Zibel*
Alexander S. Elson*
National Student Legal Defense Network

Anna Singleton*
Chehardy, Sherman, Williams,
Recile & Hayes, LLP

*Attorneys for Plaintiff*
*\*Pro hac vice forthcoming*